CITY OF BANGOR, IN EQ.
*vs.*
MERRILL TRUST COMPANY
MARY F. BASS
ELAINE BASS PIERCE
HAROLD M. PIERCE ET AL.

Penobscot.    Opinion, August 24, 1953.

*Abraham J. Stern,* for plaintiff.

*Keith & Keith,*
*James M. Gillin,*
*Michael Pilot,*
*Benjamin W. Blanchard,* for defendants.
*David B. Soule,* for State.

SITTING: MERRILL, C. J., THAXTER, FELLOWS, WILLIAMSON, TIRRELL, JJ. MURRAY, A. R. J.

WILLIAMSON, J. This is a bill in equity brought by the City of Bangor for the construction of the will and codicils of Joseph P. Bass and for equitable relief dependent upon such construction. The case was heard on bill, answers, replications and proof, and is before us on report to the Law Court, "which Court shall, upon Bill, Answers, Replication and so much of the evidence as is legally admissible, render such final decision as law and equity require."

The plaintiff seeks:

(1) That we determine whether or not the purposes of the Bangor Recreation Center set forth in P. & S. L., 1951, Chap. 90, Sec. 1, fall within the meaning of the phrase "Public Park purposes including, if the City sees fit, semi-public purposes such as circuses, fairs, the City charging rental for such uses at its option," found in Article 12 of the will;

(2) That if we answer (1) in the affirmative, we give instructions in the manner and extent to which the City of Bangor may go in renting, leasing or conveying to the Bangor Recreation Center such of the land area of Bass Park as may be reasonably required for its purposes; and

(3) That a successor trustee be appointed under the will to execute and deliver to the City of Bangor the deed called for under Article 12 of the will.

Joseph P. Bass, late of Bangor, died in March 1919, and his will with two codicils was approved and allowed in the following month. The provisions of the will which require construction are stated below.

In Article 11 the testator places certain property in trust, and in the final paragraph states:

"All of said income not needed to meet the payments called for in the preceding paragraphs of this Article of my will, said Trustee shall allow to accumulate until January 1, 1933, and if the City of Bangor shall accept a conveyance of the premises known as Maplewood Park and upon the conditions hereinafter specified in this will, then in that event, my said Trustee shall pay all of my said accumulated income to said City and thereafter shall, each year, pay to said City all said income not needed to make the other payments called for by the preceding paragraphs of this Article of my will, said income so to be paid to said City to be by it applied as hereinafter specified in this will."

The testator in Article 12 leaves all of the remainder of his property in trust for certain individual beneficiaries with the exception of Maplewood Park, so-called, and states in the last paragraph the following:

"Provided the City of Bangor shall on or before six months from January 1, 1933, vote to accept a deed of said Park and shall vote that said Park shall be forever used only for and devoted to Public Park purposes including, if the City shall see fit, semi-public purposes such as circuses, fairs, the City charging rental for such uses at its option; and the City shall vote that said Park shall be forever known as "Bass Park"; and the City shall vote to apply all the money which it may receive under the provisions of the trust created under Article 11 of this will only for improving, beautifying and adding to said "Bass Park" from time to time and at any time; thereupon said Trustee shall convey to said City said Park, if not already conveyed, to have and to hold to said City so long as said Park shall be used for and devoted to one or some or all of said purposes and those purposes only, and so long as said park shall be called Bass Park, and so long as said moneys to be received by said City as aforesaid shall be applied only for the aforesaid purposes or some or one of them and no longer."

The only other provision directly relating to the City of Bangor is set forth in Article 20 of the second codicil to the will, reading:

> "In regard to the provision for the City of Bangor, I further provide that my trustee shall deliver to said City of Bangor to be held in trust forever, unless forfeited, a deed of the real estate which I may own at the time of my decease, situated between Buck and Dutton Streets, and the Park and Main Street, said property to be held by said City of Bangor for the benefit of the Eastern Maine Musical Association subject to the control of said association so long as said association shall exist for the purpose of conducting a musical festival or other purposes incidental to promoting the musical or other public interests of said city except that a right of way over said property shall always be available to the park property situated westerly thereof. If said Eastern Maine Musical Association shall cease to exist or shall fail to use said property for the purposes hereinbefore mentioned said property shall revert back to the City of Bangor to be added to the Bass Park so-called created in my will and subject to the conditions and provisions in regard thereto contained in *in* said will."

The City of Bangor on three separate occasions has voted to accept the provisions of the will and codicils. Albert E. Bass, the Trustee named to convey property to the city died in 1930, and no successor trustee has been named.

The city has never received a deed to Maplewood Park, so-called, or a deed to the adjoining property described in Article 20 of the second codicil. The Eastern Maine Musical Association ceased to exist in 1943 and the property known as the Bangor Auditorium has been added to and used in connection with Bass Park.

The Bangor Recreation Center was created by P. & S. L., 1951, Chap. 90, which became effective upon acceptance by the voters of Bangor in December 1951. Section 1 reads:

"Sec. 1. 'Bangor Recreation Center' created. The inhabitants of and the territory within the city of Bangor, in the county of Penobscot shall be and hereby are constituted a body politic and corporate under the name of 'Bangor Recreation Center' for the purpose of acquiring property within said city of Bangor for recreational and municipal purposes, erecting, enlarging, repairing, equipping and maintaining on said property a building and related athletic, recreational and municipal facilities. Said district is hereby authorized to acquire land or buildings for said purposes by purchase, gift or lease and construct thereon, building or buildings for said purposes on land acquired as above. Property of said district shall be tax exempt."

The Trustees of the Bangor Recreation Center have indicated to the City of Bangor that Bass Park is their first choice for the location and erection of a recreation building, if a site in that location can legally be made available. Bass Park, including the five acres formerly occupied by the Eastern Maine Musical Association, is approximately forty-one acres in extent. The proposed building of the Recreation Center, with adequate parking facilities, would occupy about fifteen acres within what was formerly known as Maplewood Park.

At the present time there are outstanding leases of the Bass Park Fairgrounds, so-called, from the Trustees of Bass Park, who are officers of the city, to Thomas D. Mourkas, in which it appears that for a period ending in 1961 Mourkas has a lease of Bass Park, so-called, "for a period of three weeks, in each year, the first week for preparation, the second week for the Fair proper, and the third week for cleaning up," and also under amendments to the original lease of May 31, 1951, the right to conduct night racing for a stated rental per night. Under the amendments for night racing the city agrees "that the fairgrounds will not be rented to any other person for the conduct of night racing

during the period of this lease," with a provision that "if the lessee fails to conduct two weeks of night racing in any year, the city will have the right to rent the fairgrounds for this purpose to any other person in that year." There are provisions in the lease and amendments calling for improvements by the city to the premises, in particular for the erection of stables to accommodate 250 horses, and for installation of a lighting system on the race track by the lessee.

In 1950 the city leased Bass Park to Maine State Raceways for three weeks in each year through 1963 for purposes of a fair. There is now pending an action in equity between the Don-Al Corporation, as assignee of this lease, plaintiff, and Mourkas, the Bangor Fair, the Trustees of Bass Park and the City of Bangor, defendants, relating to the several leases for fair and racing purposes. We are not here interested in the merits of the litigation.

It is urged by certain of the defendants that the leases to Maine State Raceways and Mourkas are, and the use of the park for night racing would be, in violation of the conditions expressed by the testator in his will, and that therefore no trustee should be appointed, as prayed for, to convey the property to the city. We must determine then at the outset: (1) what estate the city acquired or had a right to acquire under the will; and (2) whether or not such estate has been forfeited or lost. Unless the city has an interest in the property and is entitled to a deed, it obviously would be meaningless to consider the problems relating to the Recreation Center.

The record shows that many years ago the city, having accepted the provisions of the will, was entitled to deeds of both Maplewood Park and of the Musical Association property.

For the moment we turn our attention to Maplewood Park. The terms of the proposed deed are stated in Article

12 of the will. The conveyance to the city is "to have and to hold to said City *so long as*" the property shall be devoted to the particular purposes, and *"so long as* said Park shall be called Bass Park," and *"so long as"* the trust income received under Article 11 "shall be applied only" for the designated purposes *"and no longer."* (Emphasis supplied.) The city was entitled to a deed conveying a determinable fee. The language of the will is the classic language for creation of such an estate. When and if the conditions are not fulfilled, the estate of the city in the Maplewood Park, so-called, will cease and end, and the property will revert to the heirs of the testator.

In *Pond* v. *Douglass*, 106 Me. 85, 75 A. 320, the court said at page 88:

> "The estate known in law as a base, determinable or qualified fee with the possibility of a reverter is recognized in this State and Massachusetts and is descendible. *Moulton* v. *Trafton*, 64 Maine, 218; *Farnsworth* v. *Perry*, 83 Maine, 447; *First Univ. Soc.* v. *Boland*, 155 Mass. 171.

> "By his deed conveying this lot to the proprietors of the free meeting house 'to their use and benefit so long as said lot shall be occupied for a meeting house or house of public worship' Jesse Washburn conveyed to the Society a qualified fee determinable on the cessation of the use of the lot for church purposes and retained in himself a mere possibility of reverter."

The principle is stated in 19 Am. Jur. 488, Estates, Sec. 28, as follows:

> "The classical examples which are usually given to illustrate the creation of a determinable fee are to a man and his heirs, tenants of the manor of Dale, or till the marriage of B, or so long as St. Paul's Church shall stand, or as long as a tree shall stand. In the case of a grant to A and his heirs, tenants of the manor of Dale, whenever the heirs

of A cease to be tenants of the manor of Dale, their estate determines."

An interesting illustration is found in Restatement of the Law, Property, Sec. 23, at page 57, as follows:

"A, owning Blackacre in fee simple absolute, transfers Blackacre 'to the Town of B and its successors and assigns to be held by it and them so long as the said Blackacre is used for public school purposes.' Town B has an estate in fee simple determinable. A has a possibility of reverter."

In 2 American Law of Property (1952) Sec. 9.56, it is said:

"The type of interest acquired by a municipality in a public park or square is usually dependent upon the manner of its creation. Where the land was acquired by grant, whether by purchase or by gift, the terms and provisions of the deed determine whether the municipality has acquired a fee simple absolute estate, a determinable fee simple with a possibility of reverter left in the grantor, or a mere easement of use for park purposes."

See also *Neely* v. *Hoskins,* 84 Me. 386, 24 A. 882; *Hamlin* v. *Meeting House,* 103 Me. 343, 69 A. 315; *Bancroft* v. *Sanatorium Assn.,* 119 Me. 56, 109 A. 585; *Whitmore* v. *Congregational Parish,* 121 Me. 391, 117 A. 469; *Lyford* v. *Laconia,* 75 N. H. 220, 72 A. 1085; 1 Kerr on Real Property 370; 15 A. L. R. (2nd) 975; 31 C. J. S. 22, Estates, Sec. 10; McQuillin on The Law of Municipal Corporations, 3rd. Ed. (1950.) Vol. 10, Sec. 28.52; 1 American Law of Property (1952) Sec. 4.13, Requisites for Creation of Possibility of Reverter.

Without question there exists an obligation on the part of the city to use Bass Park for the purposes set forth in the will. To this extent it may properly be said that Bass Park is held in trust. The Legislature in permitting a municipality to accept gifts for public parks and playgrounds surely intended that the wishes of the donor be honored. R. S.,

Chap. 84, Sec. 3. (Unchanged since R. S., 1916, Chap. 4, Sec. 85, before the testator's death.)

This obligation, however, does not alter the nature of the title which the city has received (or is entitled to receive) from the donor. It cannot change a determinable fee into a fee simple held in trust. No one suggests that the City of Bangor did not accept the property upon the conditions of the will. The acceptance must be of what is given. It is the donor and not the donee who measures the extent of the gift.

The case of *Manufacturers National Bank* v. *Woodward,* 138 Me. 70, 21 A. (2nd) 705, is not inconsistent with this view. There a gift by will to a town of a house and lot "for use as a public library" was held a gift in trust. The court held the trust did not fail on refusal of the town to accept the gift and ordered the appointment of a new trustee. The estate left in trust was clearly not a determinable fee. The language used does not point directly to the termination of the estate, and so the significant feature of a determinable fee is missing. There are no phrases such as "so long as" or "and no longer." Whether or not a determinable fee may be held in trust was not an issue under consideration.

The question then becomes whether or not the leasing and use of the property for a fair and in particular for night racing under the Mourkas lease are permitted under the will. If not, there follows the termination of the city's interest in the property.

If we were concerned with the use of property for public park purposes, taking the words in their ordinary meaning, it would be impossible to sustain the action of the city.

In *Campmeeting Association* v. *Andrews,* 104 Me. 342, 71 A. 1027, 1030, the court said, at page 349:

> "A park may be defined as a piece of ground set apart to be used by the public as a place for rest,

recreation, exercise, pleasure, amusement and enjoyment. See cases collected under 'Words and Phrases,' vol. 6, page 5176, title 'Park.' The full use and benefit of a park is not realized by the enjoyment only of an open view and the right of passage upon it. The right to enjoy the pleasures and advantages that beauty and ornamentation may afford is also included in the uses and purposes of a public park."

We, however, are not again defining public park purposes, but are interpreting Article 12 of the will in which the testator gives broader limits to his gift, namely, for "Public Park purposes including, if the City shall see fit, semi-public purposes such as circuses, fairs, the City charging rental for such uses."

Horse racing whether in the daytime or at night, in our view, fairly comes within the meaning and intent of the testator's gift. We find no essential difference which would permit the circus and fair and deny racing. They are all "semi-public purposes" for which the city may charge a rental with the expectation that the public will pay admission fees.

We are not here touching upon the details of the Mourkas lease or the uses intended thereunder, but upon the principle involving whether the lease of the property (and of course its use) for a period of ten years violates the limitations of the will.

We are not called upon to decide whether horse racing in daytime or at night benefits or harms the community or whether such use is wise or unwise. The point is the extent of the power of the city to act in this manner. So far as the use of the property under the lease is concerned, we see no objection thereto under the terms of the will. Nor was a lease of ten years a surrender of the property for such a clearly unreasonable time that forfeiture for the benefit of the testator's heirs has followed.

We may readily agree that a lease for the indicated purposes for, let us say, 999 years would be void, or that the city must at all times retain control of the premises, yet it is a matter of common prudence for both lessor and lessee to insist upon a lease for a term of years. Both parties require the certainty of a lease for a reasonable period to make possible a profit on their investment. We cannot say that a reasonable period is necessarily less than the ten years of the lease in question.

We find no violation by the city of the conditions surrounding the gift. There has been no termination of title, and no reversion to the testator's heirs. The city is entitled to a conveyance of Maplewood Park, and a trustee should be appointed to give the deed.

There is no necessity of discussing the nature of the title of the city in the Musical Association or Auditorium property. There is no suggestion that the same considerations about forfeiture for violation of purposes found with respect to Maplewood Park are not here equally applicable. In any event, the Bangor Recreation Center which holds our chief interest does not propose to use any of the Auditorium property, but only a part of the old Maplewood Park area.

We turn to the problems of the Bangor Recreation Center. It is a "body politic and corporate," a quasi municipal corporation, covering "the inhabitants of and the territory within the City of Bangor" for carrying out certain municipal purposes. The Bangor Recreation Center is a newcomer in the list of districts—water, school, sewer, light and power —each with a different name and for a different purpose. It is designed no doubt, apart from the administration of desired facilities, to give an opportunity for raising needed funds without use of the city's credit, although in the final event payments will be met by the taxpayers of Bangor.

The Recreation Center wishes to erect a recreation building within the Park area. Can the city grant to the Center,

a separate and distinct corporation from the city, rights which will make possible the accomplishment of its purposes?

First: The intended use is a proper use for public park purposes. We find nothing unusual or inherently wrong in the utilization of fifteen acres of the park for recreational purposes of the nature outlined in the record. It is common knowledge that auditoriums, as indeed in Bangor, and buildings of various types designed to serve the recreational and cultural needs of the public are found in parks. In *Moore* v. *Valley Garden Center,* 185 P. (2nd) 998 (Ariz. 1947), a lease to a non-profit corporation for horticultural gardens, etc., was held proper as a lease for recreational purposes.

Cases illustrating proper uses of land devoted to park purposes are: *Slavich* v. *Hamilton,* 201 Cal. 299, 257 P. 60 (Veterans' Memorial Hall); *Los Angeles Athletic Club* v. *Long Beach,* 128 Cal. App. 427, 17 P. (2nd) 1061 (Municipal auditoriums); *Aquamsi Land Co.* v. *Cape Girardeau,* 346 Mo. 524, 142 S. W. (2nd) 332 (Recreational building, community center and fair ground, including race track and athletic field); *Bernstein* v. *City of Pittsburgh,* 366 Penn. 200, 77 A. (2nd) 452 (Open air auditorium); *City of Neb.* v. *Neb. City,* 186 N. W. 374 (License for horse racing for limited periods but not to lease park for twenty-five years). See also 67 C. J. S. 859; 39 Am. Jur. 826, Parks, Sec. 29, and annotations in 18 A. L. R. 1246, 63 A. L. R. 484, 144 A. L. R. 486.

Second: We find no objection to use of land within the Park by the Bangor Recreation Center for the desired purpose under suitable arrangements with the city. No question arises of the validity of such use for the benefit of private business interests. The city and the Bangor Recreation Center are both municipal corporations. In carrying out the proposal it is not necessary that the city convey or give up control of any part of the park given by Mr. Bass.

It would be proper, in our view, for the city to lease sufficient land for purposes of the Center for a period of time covering, let us say, the estimated life of the building. The use of the building and other facilities erected and maintained by the Center must be subject to the control of the city to prevent any possible infraction by the Center, or by anyone acting under it, of the terms of the will of Joseph P. Bass. In no event, may the use by the Center extend beyond the use of the property for public park purposes within the meaning of the will.

All of the problems arising in the future from the use of Bass Park will not be settled in the decree to be entered in this case. We here answer the request for instructions about a proposed Recreation Center. In later years instructions may properly be sought in connection with other projects. The fact that the city holds a determinable fee does not preclude it from seeking aid from the court upon the construction of the will and the nature and extent of the city's authority and duties under the terms of the testator's gift.

We answer the questions asked by the plaintiff in its bill as follows: (1) The purposes of the Bangor Recreation Center come within the meaning of public park purposes, as set forth in the will of Joseph P. Bass; (2) the manner and extent to which the City of Bangor may rent or lease to the Bangor Recreation Center land within Bass Park can best be determined by the single justice under the principles stated herein; (3) the single justice should appoint a successor trustee under the will of Joseph P. Bass to execute and deliver to the City of Bangor the deed called for in Article 12 of the will. The entry will be

*Ordered that a decree be entered below in accordance herewith.*