**SUPERIOR COURT**
**OF THE**
**STATE OF DELAWARE**

PAUL R. WALLACE
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Submitted: March 17, 2026
Decided: April 30, 2026

Stephen H. Barrett, Esquire
DLA PIPER LLP
1201 N. Market Street, Suite 2100
Wilmington, DE 19801

Brett Ingerman, Esquire
Dale K. Cathell, Esquire
DLA PIPER LLP
650 S. Exeter Street, Suite 1100
Baltimore, MD 21202

David Horniak, Esquire
DLA PIPER LLP
500 8th Street, N.W.
Washington, D.C. 20004

Philip A. Rovner, Esquire
Ryan D. Kingshill, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899

J. Allen Maines, Esquire
A. Andre Hendrick, Esquire
Patrick B. Reagin, Esquire
Matt Covell, Esquire
HOLLAND & KNIGHT LLP
Regions Plaza, Suite 1800
1180 West Peachtree Street
Atlanta, GA 30309

RE:     *River Valley Ingredients, LLC, et al. v. American Proteins, et al.*
        C.A. No. N19C-12-160 PRW CCLD
        Plaintiffs' Motion for Attorney's Fees and Costs

Dear Counsel:

This Letter Decision and Order addresses Plaintiffs' Motion for Attorney's

Fees and Costs (D.I. 707). For the reasons set forth briefly below, the Motion is

**DENIED.**

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

This motion stems from a lengthy five-year litigation, arising from the acquisition of poultry rendering facilities by Plaintiffs—collectively referred to as Tyson—from Defendants, formerly operating as American Proteins, Inc. ("API").[2] Tyson sought entry into the competitive poultry rendering market of the southeastern United States.[3] API ultimately agreed to sell two plants pursuant to an Asset Purchase Agreement ("APA") executed in 2018 for approximately $865.8 million.[4] Following closing, Tyson discovered operational and profitability issues with the purchased properties and alleged that Defendants had fraudulently induced the transaction by concealing material information—most notably, those plants' prior use of SPN stickwater[5] in production and a contemporaneous process change to

---

[1]   Mindful that the parties have a complete understanding of and familiarity with the factual background and applicable agreements, the Court dispenses with a fuller recounting thereof here.

[2]   *See generally* Decision After Trial (D.I. 706).  Plaintiffs are River Valley Ingredients, LLC, Tyson Poultry, Inc., and Tyson Farms, Inc. River Valley is a subsidiary of Tyson Poultry, and Tyson Poultry is a subsidiary of Tyson Foods. For the sake of convenience and clarity, the Court will use "Tyson" when referring to the Plaintiff(s).

[3]   *River Valley Ingredients, LLC v. American Proteins, Inc.*, 2025 WL 3094942, at *3 (Del. Super. Ct. Nov. 5, 2025) (Decision After Trial) ("*River Valley Ingredients I*").

[4]   *Id.* at *5; Pls.' Mot. Costs Ex. A (D.I. 707) [the "APA"].

[5]   As the Court noted in its decision, "[i]n poultry processing, 'SPN' generally refers to Secondary Processing Nutrients. These are byproducts of wastewater treatment at poultry processing plants that can be collected, treated, and rendered into other usable feed materials." *River Valley Ingredients I*, 2025 WL 3094942, at *3 n.25. "In most instances its usage seems, at best, disfavored." *Id.* at *4.

remove it before due diligence.[6]  Tyson further alleged breaches of contractual representations and warranties within the APA.[7]  Defendants denied wrongdoing and asserted a series of counterclaims, including fraudulent inducement, tortious interference, unfair competition, and related theories.[8]

A trial was held.[9]  At the close of Plaintiffs' case-in-chief, the Court granted in part Defendants' motion under Rule 41(b), dismissing certain discrete warranty claims.[10]  The matter then proceeded through the remainder of trial and post-trial briefing, after which the Court undertook its role as factfinder.[11]

The Court found that Tyson proved, by a preponderance of the evidence, that API fraudulently induced the transaction through deliberate concealment of its historical use of SPN stickwater and the rushed removal of that practice to inflate apparent profitability.[12]  The Court further concluded that API breached certain representations and warranties under the APA—specifically those concerning past

---

[6]   *Id.* at *3–5.

[7]   *River Valley Ingredients I*, 2025 WL 3094942, at *10–14.

[8]   *Id.*

[9]   *See generally River Valley Ingredients I.*

[10]   *Id.* at *2.

[11]   *See generally River Valley Ingredients I.*

[12]   *See generally id.*

practices and contractual compliance—thereby triggering indemnification obligations.[13] Tyson didn't prevail on all asserted contractual breaches, including claims relating to books and records, regulatory compliance, and alleged nondisclosure of the Reid Report.[14] Conversely, Defendants failed to carry their burden on any of their counterclaims.[15]

The Court awarded Tyson damages in the amount of $55 million, reflecting the contractual cap and representing the benefit-of-the-bargain loss caused by Defendants' misrepresentations.[16] Having prevailed on significant claims and secured a substantial monetary judgment, Tyson now seeks an award of attorneys' fees as the prevailing party of the litigation, consistent with its interpretation of the APA's indemnity provisions.[17] Those provisions read as follows:[18]

---

[13] *See generally id.*

[14] *See generally id.*

[15] *See generally id.*

[16] *Id.* at *18–20.

[17] Pls.' Mot. Costs (D.I. 707).

[18] As discussed in the Court's post-trial decision, indemnification cannot exceed an amount equal to $55,000,000. *See generally River Valley Ingredients I*; APA § 10.3(c) ("Notwithstanding the provisions of Section 10.1 and Section 10.2, but subject to Section 10.3(a), in no event will the aggregate liability of Sellers under Section 10.1(a), or Buyer under Section 10.2(a), exceed an amount equal to $55,000,000 (the 'R&W Cap')."). But that limitation doesn't apply to claims of fraud. *Id.* at § 10.3(d) ("Notwithstanding anything to the contrary in this Agreement, including Sections 10.1 and 10.2, (i) the limitations set forth in Section 10.3(a), Section 10.3(b) and Section 10.3(c) do not apply to Losses relating to, arising out of or resulting from (A) Fraud, (B) breach of the representations and warranties set forth in Section 4.1, Section 4.2, Section 4.3(a), Section

10.1. Indemnity by Sellers. Subject to the other provisions of this Article X, from and after the Closing, Sellers shall, jointly and severally, indemnify and hold harmless Buyer, its Affiliates and their respective officers, directors, stockholders, members, managers, agents and representatives (collectively, the "Buyer Indemnified Persons") from and against any and all Losses incurred or suffered by a Buyer Indemnified Person and shall pay or reimburse, on demand, each Buyer Indemnified Person for the full amount of any such Losses relating to, arising out of or resulting from:

(a) any inaccuracy in any representation, or the breach of any warranty, made in Article IV (for purposes of determining whether an inaccuracy or breach exists and calculating any Losses arising from such inaccuracy or breach, such representation and warranty shall be read as if it were not qualified by any concept of "material," "materiality" or "Material Adverse Effect" (other than Section 4.5(b), Section 4.26(b) and the word "Material" in the term "Material Acquired Contracts" and the categories of "Material Acquired Contracts" in Section 4.9(a));

(b) any breach or failure by a Seller to duly perform or observe any term, provision, covenant or agreement to be performed or observed by a Seller in this Agreement or any other agreement contemplated herein; and

(c) any of the Retained Liabilities.[19]

The definition of "Losses" is set forth in Exhibit A to the APA, which reads as follows:

"Losses" means injuries, losses, expenses, fees, penalties, demands, claims, actions, causes of action, judgments, assessments, damages,

---

4.6(a) and (b), Section 4.25, Section 4.27, Section 5.1, Section 5.2, or Section 5.4(a), or (C) Losses arising under Section 10.1(c), and (ii) except in the event of Fraud or Losses arising under Section 10.1(c), in no event will the aggregate liability of Sellers hereunder exceed an amount equal to the Purchase Price.").

[19]    APA § 10.1(a)–(c).

obligations, liabilities and costs, including all costs incurred in connection with any claim for indemnification hereunder (e.g., reasonable legal fees, accounting fees, and all other out-of-pocket costs of investigation), of every nature and description, but excluding punitive and exemplary damages and amounts calculated as any multiple of the applicable Losses solely based on any multiple used by Buyer to determine the Purchase Price (but not excluding any other damages recoverable under Applicable Law).[20]

## II. PARTIES' CONTENTIONS

Tyson insists that it is entitled to recover its attorneys' fees and costs on both contractual and other grounds.[21] It contends that the APA's indemnification provision requires API to reimburse all "Losses," including reasonable legal fees, arising out of API's misrepresentations and breaches of warranty—liability for which has already been established at trial.[22] To Tyson, that provision applies to this litigation and is written in broad terms that encompass the full scope of its litigation expenses, without requiring a claim-by-claim allocation.[23] Tyson asserts that all claims and defenses in the case stem from the same core misconduct—API's fraudulent inducement—and therefore its fees are inseparable and fully

---

[20]  APA Ex. A.

[21]  *See generally* Pls.' Mot. Costs; Pls.' Reply (D.I. 713).

[22]  Pls.' Mot. Costs at 4–8; Pls.' Reply at 1–4.

[23]  Pls.' Mot. Costs at 4–8; Pls.' Reply at 1–4.

recoverable.[24]  Further, says Tyson, even if it couldn't recover from the contract, API's fraudulent conduct, deliberate concealment, and aggressive litigation tactics justify fee-shifting under the bad-faith exception.[25]  Finally, Tyson maintains that its requested fees are reasonable in light of the complexity, duration, and scale of the litigation, as well as the discounted billing arrangements it negotiated.[26]

API responds that Tyson isn't entitled to fee-shifting under either the APA or Delaware law.[27]  It argues that the APA doesn't clearly authorize recovery of attorneys' fees for first-party claims and contains no prevailing-party provision.[28]  So, says API, the American Rule governs.[29]  Even if some fees are recoverable, API contends they must be limited to those tied to successful claims, requiring a claim-by-claim analysis that Tyson has failed to provide.[30]  API also rejects any allegation of bad faith, asserting that its defenses were reasonable and largely successful, and that the scope and cost of the litigation resulted from Tyson's expansive and

---

[24]  Pls.' Reply at 4–5; Pls.' Mot. Costs at 7–8.

[25]  Pls.' Mot. Costs at 9–11.

[26]  *See generally* Pls.' Mot. Costs; Pls.' Reply.

[27]  Defs.' Resp. (D.I. 709).

[28]  *Id.* at 1–4.

[29]  *Id.*

[30]  *Id.* at 4–11.

ultimately unsuccessful claims rather than any improper conduct by API.[31]

## III.  APPLICABLE LEGAL STANDARDS

Under the "American Rule" and Delaware law, litigants are responsible for paying their own litigation costs, even the winners.[32]  An exception to this general rule is found in contract litigation that involves fee-shifting provisions.[33]  A fee-shifting provision allows the Court to award costs incurred during litigation to the prevailing party.[34]  When the parties' agreement governs an award of costs, the Court will look solely to that document to determine whether to award attorney's fees to the prevailing party on either an all-or-nothing or a claim-by-claim basis.[35]

---

[31]  Defs.' Resp. at 11–15.

[32]  *Mahani v. Edix Media Group, Inc.*, 935 A.2d 242, 245 (Del. 2007); *see Sternberg v. Nanticoke Memorial Hosp., Inc.*, 62 A.3d 1212, 1218 (Del. 2013) ("It has been long practice of American courts to enforce the so-called 'American Rule'—which requires each party to pay his or her own legal costs, even the prevailing party."); *see also Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2018 WL 300454, at *2 (Del. Ch. Jan. 5, 2018) (noting the Court of Chancery has applied the "predominance in the litigation" standard to prevailing-party contract provisions; that "[t]o achieve predominance, a litigant should prevail on the case's chief issue[,]" and that there are occasions where "no party may be regarded as having prevailed.").

[33]  *Mahani*, 935 A.2d at 245.

[34]  *Id*.

[35]  *Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *1–2 (Del. Ch. Apr. 27, 2004); *see also Knight v. Grinnage*, 1997 WL 633299, at *3 (Del. Ch. Oct. 7, 1997) ("Courts give great weight to contract clauses creating the right to payment of attorney's fees in subsequent litigation as the contracting parties have the opportunity to negotiate for provisions within the contract that would require one party to pay the attorney's fees of the other if they do not abide by the terms of the contract.").

In fee-shifting cases, Delaware courts are also tasked with determining the reasonableness of the fees sought using the Delaware Lawyers' Rules of Professional Conduct Rule 1.5 factors.[36] The Court is not required to conduct a line-item review of the fees and the party seeking fees carries its burden to justify a challenged litigation decision by showing that "the services that were rendered [were] thought prudent and appropriate in the good faith professional judgment of competent counsel."[37]

## IV. ANALYSIS

The analysis of attorney's fees proceeds in two well-worn steps. First, the Court determines whether there is a valid contractual or other legal basis for shifting fees from one party to another.[38] Second, where a fee-shifting entitlement is

---

[36]   *Mahani*, 935 A.2d at 245; Del. Lawyers' Rules of Prof'l Conduct R. 1.5.

[37]   *Boeing Co. v. Spirit Aerosystems, Inc.*, 2017 WL 6021423, *3 (Dec. 5, 2017) (citing *Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 997 (Del. Ch. 2012) ("A Court's determination of reasonableness of attorney's fees 'does not require that this Court examine individually each entry and disbursement' or conduct an independent inquiry of the appropriateness of counsel's fee for a particular filing of litigation tactic.").

[38]   *Dover Hist. Soc., Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1090 (Del. 2006) ("[I]n an action at law, absent a statutory or contractual provision, a court may not ordinarily order the payment of attorneys' fees as costs to be paid by the losing party."); *In re Delaware Pub. Schs. Litig.*, 312 A.3d 703, 716 (Del. 2024) ("Delaware recognizes only a limited number of exceptions to the American Rule. For example, fees may be shifted if: (i) recovery of fees is provided by statute or court rule; (ii) there is a contractual provision regarding entitlement to attorneys' fees; (iii) a party has acted in bad faith in connection with the conduct of the litigation process; (iv) a party fails to abide by a court order or is held in contempt; and (v) the action results in the creation, protection or distribution of a common fund or confers a corporate benefit.").

established, the Court evaluates whether the fees sought are reasonable.[39]

But absent a contractual basis (or other applicable theory for shifting of fees) the analysis ends and there is no need to assess the reasonableness of fees sought. Such is the case here. Because Tyson can neither recover fees under the APA nor any other theory, the Court denies its motion.

## A. TYSON ISN'T ENTITLED TO ATTORNEY'S FEES.

Tyson advances two theories to recover its attorney's fees.[40] It principally relies on the APA, devoting the bulk of its briefing—including its reply—to the argument that the agreement's indemnification provisions entitle it to recover the fees incurred in this litigation.[41] In the alternative, Tyson invokes the bad-faith exception to the American Rule, pointing to API's conduct both before and during the case as a basis for fee shifting.[42] The Court is unpersuaded that either applies here and denies Tyson's request for attorney's fees.

### 1. The APA doesn't permit recovery for attorney's fees.

The Court first looks to the APA to determine whether Tyson can recover its

---

[39] *Mahani*, 935 A.2d at 245–46; *Gerlofs v. Citizens Bank, N.A.*, 2024 WL 1855354, at *8 (Del. Super. Ct. Apr. 29, 2024).

[40] *See generally* Pls.' Mot. Costs; Pls.' Reply.

[41] Pls.' Mot. Costs at 4–8; Pls.' Reply at 1–4.

[42] Pls.' Mot. Costs at 9–11.

requested fees.[43]   As already mentioned, parties may, by contract, depart from the

default and allocate post-litigation payment obligations.[44]   But because fee-shifting

represents a departure from the American Rule, Delaware courts require a "clear and

unequivocal articulation" of that intent before enforcing such provisions.[45]   And that

requirement carries particular force in the context of first-party claims—*i.e.*, claims

arising from an alleged breach of the agreement itself and litigation between the

contracting parties thereover.   Delaware courts do not presume that standard

---

[43]   In construing the APA, the Court applies the settled principles of contractual interpretation that govern under Delaware law. *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 279–281 (Del. 2022). Most centrally, the Court adheres to the objective theory of contracts, under which a contract's meaning is determined by what a reasonable person in the position of the parties would have thought the language of the contract meant rather than by any party's subjective intent. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)) ("Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."). The Court reads the contract as a whole, giving effect to each provision and avoiding constructions that render language superfluous or internally inconsistent. *Johnson & Johnson Fortis Advisors LLC,* 352 A.3d 229, 265–66 (Del. 2026) (quoting *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017)) ("We avoid interpretations that render contractual language superfluous or internally inconsistent, and we 'must read the specific provisions of the contract in light of the entire contract.'") (internal citations omitted); *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). And "[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract." *Chicago Bridge & Iron Co.*, 166 A.3d at 913–14.

[44]   *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013).

[45]   *TranSched Sys. Ltd. v. Versyss Transit Sols., LLC*, 2012 WL 1415466, at *2 (Del. Super. Ct. Mar. 29, 2012); *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *42 (Del. Ch. May 13, 2013) (same).

indemnification provisions extend to such circumstances.[46]   Absent explicit language to the contrary, indemnity provisions are understood to apply to the contract's specific indemnity obligations and reading them to cover all litigation costs arising from a dispute over the agreement itself would risk allowing routine indemnification clauses to "swallow the American Rule."[47]   For that reason, generalized or expansive indemnification language doesn't suffice.[48]   Indeed, "the broader the indemnity provision's language is, the less likely it will be read to cover first-party claims."[49]

And here, such explicit language is absent.   The APA doesn't contain a "prevailing-party" provision.[50]   It doesn't say that a party who prevails in litigation to enforce the agreement may recover its attorney's fees.[51]   It doesn't refer to fees

---

[46]   *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525, at *1 (Del. Super. Ct. Nov. 22, 2016).

[47]   *Id.*

[48]   *Fortis Advisors LLC v. Boston Dynamics Inc.*, 2025 WL 1356521, at *6 (Del. Super. Ct. Apr. 29, 2025).

[49]   *Id.*

[50]   It doesn't need to. Indeed, the term isn't magical. *Donnelly v. ProPharma Grp. Topco, LLC*, 2023 WL 5528613, at *5–6 (D. Del. Aug. 28, 2023). But it is "a hallmark term of fee-shifting provisions," and similar language must be used to show that the intent of the parties was to shift fees of the litigation. *TranSched Sys. Ltd.*, 2012 WL 1415466, at *3 (Del. Super. Ct. Mar. 29, 2012).

[51]   The closest it gets is under APA § 10.1(b), but even that provision, as will be discussed, doesn't shift litigation fees incurred when pursuing first-party claims.

incurred "between the parties," "in an action to enforce this Agreement," or any comparable terms.[52] So Tyson relies on a broad reading of Section 10.1, which is the general Seller indemnification provision.[53] Tyson's theory is as follows: Section 10.1 allows for indemnity of Losses of various breaches and failures by API; Losses includes fees; and the $55,000,000 cap on indemnity doesn't apply to fraud claims which are so intertwined with the entirety of the litigation that they can recover approximately all of their fees.[54] That construction fails to grapple with the threshold issue that Section 10.1 doesn't explicitly provide a mechanism for fee-shifting for a first-party action. And the broad reading that Tyson attempts isn't permitted.[55] Even if it were, the Court isn't convinced that the APA could cover first-party claims.

Subsection 10.1(a) covers Losses arising from inaccuracies in representations

---

[52] While none of these phrases may be mandatory, the parties still must use *some* explicit language to show intent to shift fees in this way. *See Int'l Rail Partners LLC v. Am. Rail Partners, LLC,* 2020 WL 6882105, at *5–6 (Del. Ch. Nov. 24, 2020) (collecting cases).

[53] *See generally* Pls.' Mot. Costs; Pls.' Reply.

[54] *See generally id.*

[55] *Facchina Constr. Litigs.,* 2021 WL 1118115, at *2 (Del. Super. Ct. Mar. 24, 2021) (citing *SARN Energy LLC v. Tatra Defence Vehicle A.S.*, 2019 WL 6525256, at *1 (Del. Super. Ct. Oct. 31, 2019)); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) (quoting *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *44 (Del. Ch. May 13, 2013)) ("[I]ndemnity agreements are presumed not to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent.") (internal quotation marks omitted).

or breaches of warranties made in Article IV.[56]   It isn't a fee-shifting clause applicable to litigation under the APA as a whole; it merely extends to Losses of particular parts of the contract.  Subsection (a) therefore provides no basis for an additional award of attorney's fees.[57]

That leaves Subsection 10.1(b).  On first read, Tyson's argument has some surface appeal; Subsection 10.1(b) covers "Losses" arising from "any breach or failure by a Seller to duly perform or observe any term, provision, covenant or agreement to be performed or observed by a Seller in this Agreement or any other agreement contemplated herein[.]"[58]  But that language doesn't do the work Tyson needs.  It says nothing about whether Tyson may recover attorney's fees it incurs prosecuting direct claims against its contractual counterparty—only that generally it can obtain indemnity for "Losses" that relate to various failures by API within the APA.  It isn't a prevailing-party fee-shifting provision.

The question is whether the APA authorizes recovery of attorneys' fees incurred in *this* litigation.  Tyson's fraud theory doesn't supply contractual language

---

[56]   APA § 10.1(a).

[57]   APA § 10.1(c) fares no better.  That subsection concerns Retained Liabilities, and Tyson doesn't rely on it for its fees argument.

[58]   APA § 10.1(b).

that explicitly authorizes that kind of fee shifting. It can't. Why? Because nothing in Section 10.1 clearly extends recovery to the fees Tyson incurred prosecuting its claims against API or the Defendants. Accordingly, the Court concludes that the APA doesn't contain the clear and unequivocal language required to shift attorney's fees in this first-party dispute. Tyson's request for attorney's fees is denied.

### 2. The Court doesn't find bad faith or any other basis for fee recovery.

Tyson also advances another theory for its fee-shifting prayer: API's conduct during and before litigation.[59] The bad-faith exception to the American Rule permits a court to shift fees when a party's conduct warrants it.[60] "There is no single standard of bad faith that justifies an award of attorneys' fees[.]"[61] But generally, "[f]ee shifting under the bad faith exception may be appropriate 'if a prevailing party demonstrates that the losing defendants: i) engaged in bad faith conduct that increased the costs of the litigation; or ii) engaged in pre-litigation conduct of a sufficiently egregious nature.'"[62] "To award fees under the bad faith exception, the

---

[59] Pls.' Mot. Costs at 9–11.

[60] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545–47 (Del. 1998).

[61] *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 880–81 (Del. Ch. 2012).

[62] *Enhabit, Inc. v. Nautic Partners IX, L.P*, 2024 WL 4929729, at *43 (Del. Ch. Dec. 2, 2024) (quoting *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 124 (Del. Ch. 1999)) (citing *Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997)); *see also In re SS & C Techs., Inc. S'holders Litig.*, 948 A.2d 1140, 1149 (Del. Ch. 2008).

party against whom the fee award is sought must be found to have acted in *subjective* bad faith. A finding of bad faith involves a higher or more stringent standard of proof, *i.e.,* 'clear evidence'."[63] And "the party seeking attorneys' fees 'bears the stringent evidentiary burden of producing clear evidence of bad-faith conduct.'"[64] Even then, the Court will only apply this "tool" in "extraordinary circumstances."[65]

The Court doesn't view the record as warranting fee shifting. Although the Court has found that API engaged in pre-litigation misconduct sufficient to find fraudulent inducement, that conduct—while serious—doesn't warrant the additional, discretionary remedy of fee shifting. The record demonstrates that API's wrongdoing was directed toward inflating the transaction price through concealment during due diligence, but that harm has been fully addressed through the Court's award of benefit-of-the-bargain damages, subject to the bargained-for indemnification cap. The Court doesn't find that API's conduct, either before or during this litigation, rises to the level of vexatious, bad-faith litigation behavior that

---

[63] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 232 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998) (internal citations omitted) (emphasis in original).

[64] *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2025 WL 1545444, at *5 (Del. Super. Ct. May 15, 2025)*, aff'd in part, rev'd in part and remanded*, 2026 WL 935618 (Del. Apr. 7, 2026).

[65] *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005); *DeMatteis v. RiseDelaware Inc.*, 315 A.3d 499, 508 (Del. 2024).

would justify departing from the American Rule.[66]   Both parties are sophisticated

commercial actors who negotiated an extensive contractual framework allocating

risk—including caps, deductibles, and indemnification provisions.   What's more,

the Court has already declined to impose punitive damages for lack of the requisite

maliciousness.[67]   Under these circumstances, the Court, in the exercise of its

discretion, declines to award attorney's fees.

Nor is the Court inclined to treat the tone or intensity of the parties' litigation

as a proxy for bad faith.[68]   Both sides contributed to the scope, cost, and

contentiousness of these proceedings.   The Court will not, in hindsight, single out

one party's conduct as so exceptional as to warrant reallocating fees where the

overall course of the case reflects mutual escalation rather than unilateral abuse.[69]

---

[66]   "Generally, the bad faith exception for the American Rule for attorneys' fees 'does not apply to the conduct that gives rise to the substantive claim itself.' Accordingly, 'an award of fees for bad faith conduct must derive from either the commencement of an action in bad faith or bad faith conduct taken during litigation, and not from conduct that gave rise to the underlying cause of action.'" *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 607 (Del. 2010) (quoting *Johnston v. Arbitrium (Cayman Islands) Handels,* 720 A.2d 542, 546 (Del. 1998)); *cf. Enhabit, Inc. v. Nautic Partners IX, L.P.*, 2024 WL 4929729, at *43–44 (Del. Ch. Dec. 2, 2024).

[67]   *River Valley Ingredients I*, 2025 WL 3094942, at *20.

[68]   *Cf. Wallace v. Schrock*, 2018 WL 2671746, at *3 (Del. Ch. May 30, 2018) (citing *Barrows v. Bowen*, 1994 WL 514868, at *2 (Del. Ch. 1994)) ("The bad faith exception only applies when the party in question displays 'unusually deplorable behavior.'"); *BDO USA, LLP v. EverGlade Glob., Inc.*, 2023 WL 1371097, at *16 (Del. Super. Ct. Jan. 31, 2023).

[69]   The Court may only shift fees from "the innocent to the vexatious party." *Banks v. Banks*, 135 A.3d 311, 324 (Del. Ch. 2016).

At bottom, Tyson wants to convert a vigorously litigated case into an "extraordinary" matter supporting fee shifting.  The Court won't.

## V.  CONCLUSION

Tyson hasn't identified any adequate basis—contractual or otherwise—to justify departing from the American Rule.  The APA lacks the clear and unequivocal language required to shift fees in this first-party dispute, and the record doesn't reflect the kind of egregious, bad-faith conduct necessary to warrant a bad faith finding.

Because Tyson fails at the threshold step, the Court need not reach the reasonableness of the fees sought.

Tyson must bear its own attorney's fees, costs, and expenses incurred during this litigation.  Accordingly, the Court **DENIES** Tyson's Motion for Attorney's Fees and Costs.

The parties shall confer and submit for the Court's signature an order of final judgment on or before May 15, 2026.

**IT IS SO ORDERED.**

*/s/ Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary